J-S36025-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| MONROE WEEKLEY, III | |
| Appellant | No. 1732 WDA 2014 |

Appeal from the Judgment of Sentence September 19, 2014
in the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0002162-2011

BEFORE:  PANELLA, J., JENKINS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY JENKINS, J.:                 **FILED JULY 10, 2015**

Appellant Monroe Weekley, III, appeals from the judgment of sentence entered in the Beaver County Court of Common Pleas following his jury trial conviction for third degree murder,[1] receiving stolen property,[2] and firearms not to be carried without a license.[3]  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2501(a).

[2] 18 Pa.C.S. § 3925(a).

[3] 18 Pa.C.S. § 6106(a).

J-S36025-15

In its Pa.R.A.P. 1925(a) opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. **See** 1925(a) Opinion, pp. 1-12.[4] Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

I. The [t]rial [c]ourt erred in determining that the evidence was sufficient to support a conviction for [r]eceiving [s]tolen [p]roperty, where the Commonwealth failed to offer any evidence that [Appellant] knew the firearm was stolen.

II. The [t]rial [c]ourt abused its discretion in imposing consecutive sentences, using an incorrect offense gravity score of 9 (loaded weapon) rather than 7, which resulted in an unduly harsh sentence, without considering [Appellant's] specific circumstances and rehabilitative needs when compared to the need to protect the public.

Appellant's Brief, p. 6.

When examining a challenge to the sufficiency of evidence, this Court's standard of review is as follows:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient

_____

[4] The introductory paragraph of the trial court's 1925(a) opinion incorrectly indicates that the instant matter is an appeal of the disposition of Appellant's PCRA petition. **See** 1925(a) Opinion, p. 1. In actuality, the instant appeal is of Appellant's judgment of sentence following the trial court's grant of Appellant's PCRA petition requesting reinstatement of his direct appeal rights *nunc pro tunc* after this Court dismissed his first appeal because Appellant's direct appeal counsel failed to file a brief. **See Commonwealth v. Weekley**, 424 WDA 2013, Order filed January 22, 2014. The body of the trial court's 1925(a) opinion correctly states the procedural posture of the matter (**see** 1925(a) Opinion, pp. 10-12) and the trial court's misstatement has no bearing on its thorough analysis of the issues raised.

- 2 -

evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.  Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Smith*, 97 A.3d 782, 790 (Pa.Super.2014).

Regarding Appellant's discretionary aspects of sentencing claim, we observe:

[T]he proper standard of review when considering whether to affirm the sentencing court's determination is an abuse of discretion. . . . [A]n abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.  In more expansive terms, our Court recently offered:  An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it.

*Commonwealth v. Moury*, 992 A.2d 162, 169-70 (Pa.Super.2010) (internal citations omitted).

Further, we note that "[c]hallenges to the discretionary aspects of sentencing do not entitle a petitioner to review as of right." *Commonwealth v. Allen*, 24 A.3d 1058, 1064 (Pa.Super.2011). Before this Court can address such a discretionary challenge, an appellant must comply with the following requirements:

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Id.* at 1064.

"A substantial question will be found where the defendant advances a colorable argument that the sentence imposed is either inconsistent with a specific provision of the [sentencing] code or is contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Christine*, 78 A.3d 1, 10 (Pa.Super.2013) *(internal citations omitted)*; *see also* 42 Pa.C.S. § 9781(b). "We determine whether a particular case raises a substantial question on a case-by-case basis." *Id.* at 10.

Here, Appellant filed a timely notice of appeal, and preserved his issues in a post-sentence motion. Further, Appellant's brief includes a

concise statement of the reasons relied upon for allowance of appeal pursuant to Pa.R.A.P. 2119(f). **See** Appellant's Brief, p. 10. A court's exercise of discretion in imposing a sentence concurrently or consecutively does not ordinarily raise a substantial question. **Commonwealth v. Mastromarino**, 2 A.3d 581, 587 (Pa.Super.2010), *appeal denied*, 14 A.3d 825 (Pa.2011). Rather, the imposition of consecutive rather than concurrent sentences will present a substantial question in only "the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment." **Commonwealth v. Lamonda**, 52 A.3d 365, 372 (Pa.Super.2012), *appeal denied,* 75 A.3d 1281 (Pa.2013). This Court has stated that

> a defendant **may** raise a substantial question where he receives consecutive sentences within the guideline ranges if the case involves circumstances where the application of the guidelines would be clearly unreasonable, resulting in an excessive sentence; however, a bald claim of excessiveness due to the consecutive nature of a sentence will not raise a substantial question.

**Commonwealth v. Dodge**, 77 A.3d 1263, 1270 (Pa.Super.2013), *reargument denied* (Nov. 21, 2013), *appeal denied*, 91 A.3d 161 (Pa.2014) (emphasis in original). However, an allegation that a trial court employed an improper calculation of an Offense Gravity Score raises a substantial question for appellate review. **See, e.g., Commonwealth v. Archer**, 722 A.2d 203, 210-211 (Pa.Super.1998) (claim that sentencing court used incorrect Offense Gravity Score raises a substantial question regarding

discretionary aspect); *see also Commonwealth v. Jackson*, 585 A.2d 533, 534 (Pa.Super.1991) ("Where [an] appellant avers that the sentencing court failed to properly apply the sentencing guidelines a substantial question as to the appropriateness of the sentence has been raised."). Therefore, Appellant has raised a substantial question for our review, and we can properly address Appellant's discretionary aspects of sentencing on appeal.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Kim Tesla, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. *See* Trial Court Opinion, dated November 20, 2014, pp. 12-21 (finding: (1) evidence that Appellant was in possession of firearm within three months of its theft and sold firearm after murder, without proof of ownership and with the help of a known illegal firearms dealer, was sufficient to support conviction for receiving stolen property; (2) court properly sentenced Appellant after considering 42 Pa.C.S. § 9721(b) sentencing factors, Appellant's pre-sentence report, sentencing guidelines, Appellant's prior record, evidence presented at sentencing, Appellant's allocution, and Appellant's rehabilitative needs; and (3) court properly employed offense

gravity score of 9[5] because jury could infer that firearm Appellant used to shoot victim was loaded while in Appellant's possession). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/2015

---

[5] In sentencing Appellant on the firearms not to be carried without a license conviction, the trial court would have properly used an offense gravity score of 9 if the weapon were loaded, whereas an offense gravity score of 7 would have been appropriate were the weapon unloaded.

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CRIMINAL DIVISION – LAW

COMMONWEALTH OF PENNSYLVANIA,              :
                                            :
        vs.                                 :
                                            :        No. 2162 of 2011
                                            :
MONROE WEEKLEY, III,                        :
                                            :
        Defendant                           :

Tesla, J.                                                November 20, 2014

## RULE 1925(a) OPINION

Before this Court for disposition is the petition for post-conviction collateral relief under the Post Conviction Relief Act (hereinafter, "PCRA") filed on behalf of Defendant Monroe Weekly, III. This is the second time this matter has been appealed, and this the second 1925(a) Opinion issued by this Court. For the reasons stated below, Defendant's Petition is denied.

### FACTS AND PROCEDURAL HISTORY

#### A. Facts and Investigation

This matter arises out of the death of Rashawn T. Cameron. At approximately 11:35 a.m. on Sunday, November 21, 2010, the Beaver County 911 Emergency Control Center received a telephone call from an unidentified female located at the residence of Willie Martin at 308 Cooper Street, Aliquippa, Pennsylvania. The female reported that, inside the residence, an unknown male was lying on the living room couch unresponsive and bleeding from the face. As a result of the caller's information, the Emergency Control Center dispatched Aliquippa Police to the reported address. Upon arrival at the residence at approximately 11:40 a.m., the responding officers observed a black male identified as Rashawn T. Cameron (hereinafter, "Cameron") lying in a pool of blood. His waist was positioned at the edge of a seat cushion with his feet resting on

1

## APP. B

the floor. A preliminary examination of Cameron's body by the responding officers and Deputy Coroner Wayne Tatalovich revealed that Cameron sustained a gunshot wound to the back of his head behind his left ear with a large exit wound on his forehead above the right eye. He was pronounced dead at the scene. During the search of the crime scene, law enforcement located fragments of a lead projectile. After performing an autopsy, Dr. James Smith determined that Cameron died as a result of the gunshot wound and that Cameron was the victim of a homicide.

On February 10, 2011, Assistant Chief County Detective Andrew Gall and County Detective Robert Heberle interviewed Bradley J. Karas (hereinafter, "Karas") in connection with their investigation of this matter. Karas told the officers that, during the morning of November 21, 2010, he was sleeping at the residence of James C. Stewart III (hereinafter, "Stewart") at 181 Baker Street, Aliquippa, Pennsylvania. According to Karas, Defendant arrived at Stewart's residence between 6:30 a.m. and 7:30 a.m. wearing dark jeans, black boots, a black hoodie, and carrying a black book bag. Karas stated that, after seeing Defendant, he fell asleep again and awoke at approximately 10:30 a.m. Shortly thereafter, Karas walked into the kitchen and observed Defendant and Stewart talking. Karas stated that he also observed Defendant remove what appeared to be a .44 caliber Smith and Wesson revolver handgun from his black book bag. Defendant then asked Karas to take the handgun downstairs to clean it and warned that the handgun should not be touched until after it was cleaned. Karas stated that, after he complied with Defendant's request, Defendant and Stewart left Stewart's residence and attempted to sell the handgun to James E. Connor III (hereinafter, "Connor").

Karas told Detectives Gall and Heberle that, upon returning to Stewart's residence, Defendant described the murder of Cameron. Defendant told Karas that he and an unidentified black male purchased a $50.00 piece of crack cocaine from an unidentified individual at a crack

2

house on Plan 11 in Aliquippa. Defendant, the unidentified black male, and someone Defendant referred to as the "Vic" went outside of the crack house for about a minute and then the "Vic" and Defendant went back inside the crack house. Defendant stated that, when the "Vic" sat on the couch and bent over to retrieve something from under the coffee table, Defendant shot the "Vic" in the head. Defendant stated that he attempted to rob the "Vic" but found nothing in his pockets. Defendant then walked to Valley Terrace, left his clothes near a dumpster, and proceeded to Stewart's residence.

After he related these events, Defendant remained at Stewart's residence until approximately 4:00 p.m., when an unidentified white female driving a white Chevrolet Cavalier picked Defendant up and drove him from the residence. Karas told the detectives that, as Defendant left, he was carrying the same black book bag that had previously held the revolver.

Also on February 10, 2011, Detective Heberle and Sergeant Steve Roberts of the Aliquippa Police Department reported to Connor's residence at 171 Baker Street, Aliquippa, Pennsylvania to question Connor and to attempt to retrieve the .44 caliber revolver that Stewart allegedly sold to Connor on behalf of Defendant. Connor admitted that he purchased a .44 Magnum Ruger Redhawk revolver (hereinafter, "Redhawk revolver") from Stewart, and, based on information provided by Connor, the investigators were able to recover the Redhawk revolver. Through an inquiry conducted at the Beaver County Emergency Control Center, law enforcement officials discovered the identity of the owner of the Redhawk revolver and that it was reported missing by the owner in May of 2010.

On February 11, 2011, Connor reported to the police station and provided a statement regarding how he acquired the Redhawk revolver. Connor indicated that, at some point towards the end of November 2010, Stewart came to his residence and sold him the Redhawk revolver

3

for $400.00. Stewart told Connor that he would be unable to transfer ownership of the firearm until he located the previous owner.

Later that day, Sergeant Roberts, Detective Heberle, and Captain Anthony Q. McClure interviewed Stewart at the Aliquippa Police Department. Stewart told the officers that, on the morning of November 21, 2010, he awoke to find Defendant in his residence. According to Stewart, Defendant stated that he had done something bad and proceeded to tell Stewart about the murder of Cameron. Defendant stated that he regretted bringing Cameron to Stewart's residence to purchase a gun because Cameron was working with the police and Cameron owed him $600.00. Defendant also stated that, at approximately 3:00 a.m. earlier that morning, Defendant went to Willie Martin's residence to get his money from Cameron and caught Cameron doing something "foul" as he entered the house. Defendant stated that he then aimed his gun at Cameron and demanded his money. According to Defendant, Cameron reached for his gun and a fight over Defendant's gun ensued. Defendant stated that he ultimately struck Cameron with his gun and then shot him.

Stewart told the officers that, following this conversation, Defendant asked Karas to clean his gun, and Karas complied. After cleaning the gun, Karas wrapped it in a black t-shirt and placed it in Defendant's black book bag. Stewart indicated that Defendant offered to sell the gun to him but Stewart declined and suggested selling it to Connor. Defendant agreed, and Stewart went to Connor's residence to arrange the deal. Stewart stated that he gave Connor's money to Defendant and that Defendant handed Stewart the black book bag containing the gun. Stewart then gave the gun to Connor and returned the black book bag to Defendant.

On February 17, 2011, Detective Heberle, Captain McClure, and Detective Tim Staub interviewed Roger L. Henderson, Jr. (hereinafter, "Henderson") regarding a statement Stewart

4

made to him. Henderson indicated that. on December 29, 2010, he met with Stewart to exchange handguns. According to Henderson. Stewart stated that Defendant had previously given him a bloody handgun that was used in the shooting death of Cameron.

On February 18. 2011. Sergeant Donald Couch of the Aliquippa Police Department submitted the Redhawk revolver and the mutilated bullet fragment seized from the crime scene to the Pennsylvania State Police Greensburg Regional Crime Laboratory. On February 24. 2011, the forensic scientist from the serology department at the Greensburg Laboratory notified Sergeant Roberts that the firearm tested positive for the presence of blood and that there would be future tests comparing the blood from the firearm with the blood samples obtained from Cameron. The forensic examination also revealed that the mutilated bullet fragment recovered from the crime scene was discharged from the Redhawk revolver.

On February 28, 2011. Captain McClure submitted an application for a search warrant requesting that he be permitted to take the following actions: report to the Community College of Beaver County. where Defendant was a student, and seize the black book bag Defendant may be carrying and the black boots and black hoodie he may be wearing; transport Defendant to the Heritage Valley Medical Center so that two purple top tubes of blood may be extracted from him; search Defendant's residence at 717 Washington Street. Aliquippa. Pennsylvania as well as the curtilage for any black book bags, .44 caliber ammunition. black boots, black hoodie. indicia of residence, and any other items believed to be associated with the shooting death of Cameron; and search any vehicles that are possessed by Defendant. In support of his request. Captain McClure's application included the information listed above that was gathered from the witness interviews and initial investigation. At 8:40 a.m. on February 28. 2011. the Honorable Judge John P. Dohanich signed and authorized Captain's McClure's search warrant application.

5

After securing the search warrant, Captain McClure and other detectives proceeded to the Community College of Beaver County to execute the search warrant. Upon arriving at Defendant's class, the detectives and campus security asked the instructor to have Defendant exit the classroom. Defendant stepped into the hallway, and the detectives put him in handcuffs. He was subsequently searched for weapons, and a campus security officer took the black book bag he was carrying and gave it to the detectives. Defendant was then transported to the detectives' office. While at the office, the detectives discovered that the search warrant (hereinafter, "unexecuted search warrant") they obtained earlier that day provided the wrong date of birth and wrong Pennsylvania Driver's License Number for Defendant. After realizing their mistake, the officers transported Defendant back to the Community College and returned his book bag to him.

Later that day, Captain McClure retyped the search warrant application and submitted it to Judge Dohanich, who signed and authorized it at 3:20 p.m. Other than the corrected date of birth and driver's license number, the new search warrant contained the same information as the unexecuted search warrant. After obtaining the search warrant (hereinafter, "search warrant for Defendant's clothes, book bag, and blood"), the detectives proceeded to Defendant's residence at approximately 5:05 p.m. and searched the premises, seizing Defendant's black and plaid Dakine back pack from his living room as well as Defendant's Carhart black hooded jacket size 5X, black and yellow reversible hooded sweatshirt, and black Nike Reax size 13 shoes from his person. They subsequently transported Defendant to the Heritage Valley Medical Center to have Defendant's blood drawn, ultimately obtaining two purple capped tubes of Defendant's blood.

At approximately 9:00 p.m. on March 1, 2011, Captain McClure again met with Stewart, who indicated that he received a call from Defendant on his cell phone earlier that evening. According to Stewart, Defendant related to Stewart how the police drew blood from him and

6

seized his book bag and some of his clothing on February 28, 2011. Defendant also indicated that he believed it was Karas, Alvin J. Flowers (hereinafter, "Flowers"), or a woman named Donzi Perry (hereinafter, "Perry") who were providing information about Cameron's murder to the police. Defendant explained that both Perry and Flowers had first-hand knowledge of the homicide because Perry was sitting outside of Willie Martin's home when it occurred and Flowers was performing oral sex on Cameron inside the house just before Defendant shot Cameron. Stewart told Captain McClure that, at some point during his conversation with Defendant, Stewart suggested that they communicate by text message rather than talk on the phone. Defendant agreed, and the two sent several text messages to each other speculating about who was responsible for notifying law enforcement about the homicide. During the interview, Stewart permitted Captain McClure to review the text messages using Stewart's cell phone. Captain McClure reviewed the messages and identified (724) 406-2036 as Stewart's cell phone number and (724) 513-1579 as the number for the cell phone Defendant was using.

On March 3, 2011, Captain McClure sent preservation letters to Cricket Communications and Sprint / Nextel Communications to preserve the records from Stewart's and Defendant's cell phone numbers, respectively. Captain McClure requested that the subpoena compliance departments of the companies preserve these records for the period of February 28, 2011 to March 3, 2011. On March 12, 2011, the subpoena specialist for Sprint / Nextel Communications confirmed that the call detail records, subscriber information, and customer account notes for the cell phone number (724) 513-1579 were being preserved. The subpoena specialist further indicated that a search warrant was required to release any content or stored communications.

On March 14, 2011, Captain McClure submitted two search warrant applications requesting the billing and account information, call detail records, and text messages for

Stewart's and Defendant's cell phones. The applications contained information obtained from the March 1, 2011 interview of Stewart as well as the same information included in the application for the search warrant for Defendant's clothes, book bag, and blood. On March 14, 2011, this Court signed and authorized the search warrant for Stewart's cell phone records at 3:05 p.m. as well as the search warrant for Defendant's cell phone records (hereinafter, "first search warrant for Defendant's cell phone records") at 3:15 p.m. Based on a review of the record, no evidence was obtained as a result of these search warrants.

## B. Criminal Proceedings

On July 18, 2011, Sergeant Roberts filed a Criminal Complaint against Defendant, charging him with criminal homicide (18 Pa.C.S.A. § 2501(a)), robbery (18 Pa.C.S.A. § 3701(a)(1)(i)), receiving stolen property (18 Pa.C.S.A. § 3925(a)), firearms not to be carried without a license (18 Pa.C.S.A. § 6106(a)(1)), and crimes committed with firearms (18 Pa.C.S.A. § 6103). On the same day, a warrant was issued for Defendant's arrest, and Defendant was taken into custody. While incarcerated in the Beaver County Jail, Defendant's phone conversations were recorded. During these conversations, a message was broadcasted multiple times warning that the conversation was being recorded. On September 2, 2011, a subpoena duces tecum was issued for recorded telephone conversations involving Defendant from the date of his incarceration to September 1, 2011. Warden William Schouppe of the Beaver County Jail complied with the subpoena (hereinafter, "subpoena for jail recordings").

On November 15, 2011, a subpoena duces tecum was issued to Sprint / Nextel for the subscriber information, call detail records including text messages, and cell site tower location data for cell phone number (724) 513-1579 for the dates and times of November 19, 2010 at 12:00 p.m. to July 18, 2011 at 12:00 p.m. Sprint / Nextel did not provide any of the requested

8

information except for a list of phone numbers and a letter stating that the requested data could not be supplied because the proper paperwork was not issued. As a result, on November 23, 2011, Detective Chamberlain submitted an application for search warrant requesting the same information for the period of November 19, 2010 at 12:00 p.m. to November 18, 2011 at 12:00 p.m. In the affidavit, Detective Chamberlain indicated that Stewart testified during the November 9, 2011 preliminary hearing regarding communications he had with Defendant. Stewart testified that he was receiving text messages from Defendant, who was using a cell phone with the number (724) 513-1579. Detective Chamberlain also indicated that he verified that this cell phone was active before, during, and after the investigation into Cameron's death. At approximately 1:12 p.m. on November 23, 2011, Judge Dohanich signed and authorized the search warrant (hereinafter, "second search warrant for Defendant's cell phone records"). Sprint / Nextel provided the requested information on December 5, 2011.

On that same date, the Commonwealth filed an information charging Defendant with criminal homicide, robbery, receiving stolen property, and firearms not to be carried without a license. On May 21, 2012, Defendant filed an Omnibus Pre-Trial Application, which included several different motions. A hearing on Defendant's Application was held on June 1, 2012 and June 4, 2012. During the hearing, the Court denied Defendant's request for a bill of particulars, and in an Order filed on June 11, 2012, the Court addressed Defendant's discovery issues. On July 5, 2012, the Court issued an Order denying Defendant's Motion to Suppress Evidence.

Trial in this matter commenced on August 6, 2012. During the testimony of Stewart, the Commonwealth displayed to the jury a series of photographs of text messages exchanged between Defendant and Stewart on March 1, 2011. Defendant initially objected to the presentation and admission of the photographs, and the Court overruled Defendant's objection.

9

On August 10, 2012, Defendant filed a Trial Motion for Suppression of Evidence and Mistrial, seeking to suppress the text message exchange and all evidence derived from the seizure of it. According to Defendant, Stewart testified that he sent text messages to Defendant at Captain McClure's direction in violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act (hereinafter, "Wiretap Act"). The Court held a hearing on Defendant's Trial Motion on August 14, 2012 and issued an Order on August 15, 2012 denying Defendant's Trial Motion. The trial concluded on August 20, 2012 with a jury verdict of guilty on the charges of third degree murder, firearms not to be carried without a license, and receiving stolen property and a jury verdict of not guilty on the charges of first and second degree murder and robbery.

On October 3, 2012, Defendant was sentenced to serve an aggregate term of 24 and one-half years to 52 years of incarceration and to pay an aggregate fine of $11,500.00. In addition Defendant was ordered to pay restitution in the amounts of $9,440.00 to the Pennsylvania State Police Laboratory for lab fees, $1,711.00 to Cameron's father for funeral expenses, and $6,500.00 to the Victims Compensation Fund for funeral expenses. On October 15, 2012, Defendant filed an Omnibus Post-Sentence Application containing a Motion in Arrest of Judgment, a Motion for a New Trial, and a Motion for Modification of Sentence. Following the transcription of the notes of testimony, Defendant filed a Supplemental Omnibus Post-Sentence Application on January 2, 2012. Oral argument on Defendant's post-sentence motions was held on February 4, 2013. On February 8, 2013, the Court issued an Order denying Defendant's post-sentence motions.

### C. Defendant's First Appeal

On March 5, 2013, Defendant filed an appeal of the February 8, 2013 Order. That appellate case was docketed as Case No. 424 WDA 2013. Defendant was directed to file a Rule

10

1925(b) statement, which he submitted on March 25, 2013. Defendant raised numerous allegations of error in his 1925(b) statement. An extensive 1925(a) Opinion was issued on April 29, 2013 addressing the twenty-one issues.

Defendant's counsel, Dennis DiMartini, was granted three extensions by the Superior Court to file an Appellate Brief. The first extension was granted on June 20, 2013, the second on September 19, 2013, and the third on November 22, 2013. Defendant's counsel then failed either to file an Appellate Brief or to request another extension. The Superior Court dismissed Defendant's appeal on January 22, 2014 for failure to file a Brief.

### D. Defendant's Current Appeal

Defendant's case having been dismissed due to his counsel's failure to file an Appellate Brief or request an additional extension, Defendant himself filed *pro se* a Post Conviction Relief Act Petition on March 17, 2014. On April 3, 2014, new counsel was appointed for Defendant and Defendant's Motion for an extension of time in which to file an amended PCRA petition was granted on May 7, 2014. The Amended PCRA Petition was filed on July 7, 2014. Through his Amended PCRA Petition, Defendant argued ineffective assistance of his prior counsel, Dennis DiMartini, on the basis of counsel's failure to file a timely brief which resulted in the dismissal of Defendant's first appeal. Defendant's sole request for relief was that his appeal rights be reinstated *nunc pro tunc*.

On September 19, 2014, The Court signed an Order reinstating Defendant's appellate rights and granting him 30 days in which to file a notice of appeal. Defendant filed his notice of Appeal on October 17, 2014. On October 31, 2014, the Court issued an Order directing Defendant to file a 1925(b) Concise Statement of Matters Complained of on Appeal. Defendant filed his Concise Statement the same day, raising only two issues. These two issues, challenging

11

the sufficiency of the evidence with regard to the Receiving Stolen Property charge and the propriety of Defendant's sentence, are the same first two issues previously raised by Defendant's counsel Dennis DiMartini in his 1925(b) Concise Statement from his first appeal.

## ANALYSIS

The Court has reviewed Defendant's new Concise Statement and the two issues now raised appear to be the same as those previously addressed by the Court in its first 1925(a) Opinion. In the interests of judicial efficiency, rather than simply referring to an attached copy of this Court's lengthy response to the twenty-one issues previously raised by Defendant's counsel Dennis DiMartini, this Court instead will, for the convenience of appellate review, reproduce here only those portions from the Court's first 1925(a) opinion which may be relevant to the two issues being now raised again. Although the sentencing issues complained of in Defendant's first Concise Statement were broader than those which are raised at present appear to be, in order to comprehensively address any of Defendant's legitimate sentencing issues, the Court's entire sentencing analysis is here included with additional explanatory footnotes distinguishing Defendant's first and second Concise Statements.[1]

### A. Sufficiency of Evidence

Defendant's first allegation of error is that the Court improperly held that the record evidence was sufficient to support the finding that Defendant was guilty of receiving stolen property. When reviewing a sufficiency of the evidence claim, the standard to be applied is whether the evidence, when viewed in the light most favorable to the verdict winner, is sufficient

---

[1] Nevertheless, Defendant is limited to those issues raised in his present 1925(b) Concise Statement. Com. v. Butler, 571 Pa. 441, 445, 812 A.2d 631, 633 (2002) ("In *Lord*, however, this Court eliminated any aspect of discretion and established a bright-line rule for waiver under Rule 1925: '[i]n order to preserve their claims for appellate review, [a]ppellants must comply whenever the trial court orders them to file a Statement of Matters Complained of on Appeal pursuant to Rule 1925. Any issues not raised in a 1925(b) statement *will be deemed waived.' Lord*, 719 A.2d at 309 (emphasis added). Thus, waiver under Rule 1925 is automatic.").

12

to enable the fact-finder to find that all of the elements of the crimes were established beyond a reasonable doubt. Commonwealth v. Hartzell, 2009 Pa. Super. 237. 988 A.2d 141. 143 (2009). The Court is also required to give the Commonwealth the benefit of all reasonable inferences to be drawn from the evidence. Commonwealth v. Kendricks. 2011 Pa. Super. 218, 30 A.3d 499, 508 (2011). In applying this standard. the entire record and all evidence should be evaluated and considered. Commonwealth v. Hairston. 603 Pa. 660. 668. 985 A.2d 804, 809 (2009) (citing Commonwealth v. Kennedy. 598 Pa. 621. 959 A.2d 916, 920 (2008)). "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Commonwealth v. Brown. 2011 Pa. Super. 67. 23 A.3d 544, 559 (2011).

"A person is guilty of [receiving stolen property] if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen. or believing that it has probably been stolen. unless the property is receiving, retained or disposed with intent to restore it to the owner." 18 Pa.C.S.A. § 3925(a). Accordingly, the elements of receiving stolen property are as follows: (1) intentionally acquiring possession, control or title, retaining. disposing, or lending on the security of movable property of another; (2) with knowledge or belief that it was probably stolen: and (3) intent to deprive permanently. Commonwealth v. Young. 2011 Pa. Super. 277. 35 A.3d 54, 63 (2011).

In his Rule 1925(b) statement. Defendant does not specify what part of the Commonwealth's case that he found lacking with respect to the receiving stolen property charge. In his Omnibus Post-Sentence Application. however. Defendant claims that insufficient evidence was presented at trial to establish the second element of receiving stolen property. that he had knowledge that the Redhawk revolver was probably stolen. Defendant states that the only

13

evidence presented at trial that relates to this element is the evidence that he did not steal the gun and the evidence that he was in possession of the gun six months after it was reported stolen. Defendant argues that possession of a stolen item six months after it was reported stolen does not support an inference that Defendant knew the firearm was stolen.

The Superior Court of Pennsylvania has stated:

[A] permissible inference of guilty knowledge may be drawn from the unexplained possession of recently stolen goods without infringing upon an accused's right of due process or his right against self-incrimination, as well as other circumstances, such as the accused's conduct at the time of the arrest. Nonetheless, the mere possession of stolen property is insufficient to prove guilty knowledge, and the Commonwealth must introduce other evidence, which can be either circumstantial or direct, that demonstrates that the defendant knew or had reason to believe that the property was stolen. This additional evidence can include the nature of the goods, the quantity of the goods involved, the lapse of time between possession and theft, and the ease with which the goods can be assimilated into trade channels. Further, whether the property has alterations indicative of being stolen can be used to establish guilty knowledge. Finally, even if the accused offers an explanation for his possession of stolen property, the trier of fact may consider the possession as unexplained if it deems the explanation unsatisfactory.

Commonwealth v. Foreman, 2002 Pa. Super. 125, 797 A.2d 1005, 1012-13 (2002) (internal citations omitted). Other factors to consider "include but are not limited to the unexplained possession of recently stolen property, flight from the police or other evidence indicating an attempt to avoid capture and the condition of the property indicating a theft." Commonwealth v. Carson, 405 Pa. Super. 492, 497, 592 A.2d 1318, 1321 (1991).

Defendant is correct that some of the testimony at trial indicated that he was in possession of the firearm six months after it was reported stolen. James Sarvey, the record owner of the firearm, testified on redirect examination that he would have no reason to doubt a Raccoon Township police report which indicated that the firearm was stolen on May 8, 2010. N.T., 8/13/12, at 21. He also testified, however, that he believed he reported the firearm stolen on

14

October 10, 2010. Id. at 17. Furthermore, there was evidence presented at trial indicating that Defendant was in possession of the stolen firearm earlier than six months after it was reported stolen. Larry Alston testified that he gave Defendant a ride to the community college in August or September of 2010 and observed in Defendant's bookbag the barrel of a revolver that matched the description of the Redhawk revolver. Id. at 25, 28. As a result, the jury was presented with evidence indicating that Defendant was in possession of the stolen firearm one, three, or four months after it was reported stolen. The Court concludes that this was sufficient evidence to permit the jury to find that Defendant was in possession of the firearm sooner than six months after it was reported stolen.

In addition to this evidence, the jury was entitled to consider the nature of the stolen property. As a firearm, the Redhawk revolver was subject to a highly regulated process to achieve legal transfer of ownership. Substantial evidence was presented at trial indicating that Defendant, in selling the Redhawk revolver, enlisted Stewart, a known illegal firearms trafficker, to act as his agent. When the Redhawk revolver was sold to Connor, no proof of ownership was provided by Defendant and no legal transfer of ownership occurred, even though Connor made known that his full payment for the firearm was conditioned upon the transfer of ownership. N.T., 8/8/12, at 27-29, 40. The absence of any documentation demonstrating the legality of Defendant's possession and sale of the Redhawk revolver as well as Defendant's decision to sell the firearm with the help of a known illegal firearms trafficker permits an inference of guilty knowledge, when combined with the evidence of Defendant's unexplained possession of the firearm approximately three months after it was reported stolen. There is no indication that Defendant challenges the sufficiency of the evidence for any other element of the receiving

15

stolen property charge. Therefore, the Court concludes that sufficient evidence was presented at trial for the jury to find Defendant guilty of receiving stolen property.

### B. Sentencing

In his next issue on appeal, Defendant challenges various aspects of the sentence imposed upon him by this Court on October 3, 2012. Specifically, Defendant states in his 1925(b) statement:

> The Court abused its discretion in imposing an aggregate of consecutive minimum and maximum sentences carefully designed to impose a virtual life sentence contrary to the verdict by imposing the virtual maximum penalty permitted under the Sentence Code, where the Offense Gravity Score (O.G.S.) for Carrying Firearm Without a License was incorrect, nothing in the record could support a finding of either an aggravating circumstance or the death had a great impact on the community, evidence in the record could support a finding of mitigated circumstances, and amounts to an unwarranted expression of victim family sympathy, and the monetary penalty disregarded the rehabilitative needs of Defendant and is tantamount to cruel and unusual punishment.[2]

Def.'s 1925(b) statement. The Superior Court has repeatedly stated:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

Commonwealth v. Glass, 2012 Pa. Super. 137, 50 A.3d 720, 727 (2012). "The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is 'in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it.'" Commonwealth v. Perry,

---

[2] Defendant's present Concise Statement states only, "The Trial Court abused its discretion in imposing consecutive sentences, using an incorrect offense gravity score of 9 (loaded weapon) rather than 7, which resulted in an unduly harsh sentence, without considering Mr. Weekley's specific circumstances and rehabilitative needs when compared to the need to protect the public." Thus, it appears that Defendant's present sentencing issue complained of on appeal is more narrow and focused than that previously raised.

16

612 Pa. 557. 565. 32 A.3d 232. 236 (2011) (citing Commonwealth v. Walls. 592 Pa. 557. 926 A.2d 957 (2007)). "Moreover. the sentencing court enjoys an institutional advantage to appellate review, bringing to its decisions an expertise. experience. and judgment that should not lightly be disturbed." Id. at 237. Nevertheless. the Court's discretion is not unfettered. "When imposing a sentence. the sentencing court must consider the factors set out in 42 Pa.C.S. § 9721(b). that is. the protection of the public. gravity of offense in relation to impact on victim and community. and rehabilitative needs of the defendant" as well as the sentencing guidelines. Commonwealth v. Culverson, 2011 Pa. Super. 255. 34 A.3d 135. 144 (Pa. Super. 2011).

For several reasons. Defendant requests that the Court decrease the minimum and maximum sentence for each count with which he was charged. run the sentences on the lesser counts concurrently. and lower the monetary penalty. In response to Defendant's overall request for a reduction in his sentence. the Court offers the following general explanation for the sentence imposed.[3] Following a lengthy jury trial. Defendant was convicted of third degree murder. receiving stolen property. and firearms not to be carried without a license. The evidence presented indicated that Defendant shot the victim at close range. execution style, behind the ear in the back of the head. The shot fired was powerful enough to destroy a large portion of the victim's skull and travel through a nearby wall before coming to rest on the porch outside. The firearm Defendant used was a .44 Magnum revolver with a 12-inch barrel. The jury determined that the firearm was stolen and that Defendant knew or should have known that it was stolen. Under 18 Pa.C.S.A. § 6105(a)(1) and (b). Defendant was prohibited from possessing or transferring a firearm due to his prior conviction for burglary. which was found to be a home invasion and therefore constituted a crime of violence. Defendant disregarded this prohibition

---

[3] The Court also outlined the reasoning for its sentence during the sentencing hearing on October 3. 2012. N.T.. 10 3 12. at 97-100.

17

and committed third degree murder using an illegal weapon. Defendant's actions demonstrate that he poses a significant threat to the public, especially in light of the fact that Defendant exhibited no remorse or sympathy whatsoever for the loss suffered by the victim's family. Defendant's crimes cannot be attributed to youth, nor can his mistakes be blamed upon his environment or his chosen lifestyle being the only one available to him. Defendant was a 27-year-old adult at the time these crimes were committed. Prior to committing these crimes, Defendant had numerous educational and athletic opportunities available to him. He received athletic scholarships and attended five different colleges, but, in one way or another, Defendant neglected to take full advantage of these opportunities. Instead, Defendant chose a path that ultimately led to the shooting death of Cameron. In light of these considerations and after a thorough review of the pre-sentence report[4], sentence guidelines, and applicable law, the Court, acting within its discretion, imposed its sentence upon Defendant.

Defendant claims that the aggregate sentence imposed constitutes a "virtual life sentence." Defendant was sentenced to undergo imprisonment for 24 and one-half years to 52 years after being found guilty of third degree murder, receiving stolen property, and firearms not to be carried without a license. At the time of sentencing, Defendant was 29 years old. Such a sentence does not constitute a "virtual life sentence." Furthermore, Defendant cites no authority demonstrating how this sentence, which is permitted by statute and within the sentencing guidelines, is somehow a misapplication of the law or a manifestly unreasonable decision.

Defendant also claims in his allegation of sentencing error that the Court imposed the virtual maximum penalty allowed by the Sentence Code. Defendant does not assert that the sentence was either prohibited by statute or contrary to the sentencing guidelines themselves. In

[4] "[W]here the trial court is informed by a pre-sentence report, it is presumed that the court is aware of all appropriate sentencing factors and considerations." Commonwealth v. Ventura, 2009 Pa. Super. 96, 975 A.2d 1128, 1135 (2009).

18

addition, Defendant does not indicate why a sentence that was, in his words, the "virtual maximum penalty" was not appropriate in this instance. Assuming Defendant is alleging that it was error to run his sentences consecutively, the Court notes that "the imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment." Commonwealth v. Lamonda, 2012 Pa. Super. 180, 52 A.3d 365, 372 (2012). Taking into account the nature of Defendant's crimes, it cannot be said that the aggregate sentence was unduly harsh.

Defendant also suggests that the calculation of the offense gravity score for the count of firearms not to be carried without a license was incorrect.[5] In his Omnibus Post-Sentence Application, Defendant states that the offense gravity score was determined to be nine, indicating that the firearm Defendant carried was loaded, as opposed to seven, indicating that the firearm was unloaded. Defendant argues that nothing was presented at trial showing that the firearm was loaded while he carried it concealed. The jury was able to infer from circumstantial evidence that the Redhawk revolver was loaded at the time of concealment. Substantial evidence presented at trial demonstrated that Defendant frequently carried the firearm in his book bag. It is unlikely that Defendant, upon shooting Cameron, failed to conceal the firearm as he walked to Stewart's residence. It is also illogical that Defendant would conceal the gun when it was unloaded, as he did in Stewart's residence, but carry it unconcealed when it was loaded. Furthermore, the jury could infer from statements made during the trial that Defendant concealed the loaded weapon prior to shooting Cameron. For example, Stewart testified that Defendant told him he "pulled out his gun" before struggling with and eventually shooting Cameron. N.T., 8/8/12, at 126. The jury

---

[5] Here Defendant's previous issue raised in his first appeal appears identical to that now argued in his instant appeal, challenging application of a gravity score of 9 for a loaded weapon, as opposed to 7 for an unloaded weapon.

19

could infer from this testimony that Defendant had concealed the loaded Redhawk revolver. Therefore, the use of an offense gravity score of nine was appropriate in this case.

Defendant also asserts that nothing in the record could support a finding of an aggravating circumstance or that the victim's death caused a great impact on the community. The Court notes that Defendant was not sentenced in the aggravated range. He was sentenced in the standard range, but the sentences were run consecutively. Further, the sentence imposed was not solely based on the impact Cameron's death had on the community. The Court stated its reasons for the sentence imposed during the sentence hearing and previously in this Opinion. Apart from again restating its rationale for the sentence imposed, the Court is unable to address this issue other than to note that it acted within its discretion in sentencing Defendant. *See* Commonwealth v. Boyer, 2004 Pa. Super. 303, 856 A.2d 149 (2004) (concluding that the court did not abuse its discretion in imposing a series of consecutive, standard range sentences when the court considered the presentence report and the particular circumstance of the crime).

Defendant next argues that evidence in the record could support a finding of mitigated circumstances. In his Omnibus Post-Sentence Application, Defendant elaborates on this argument, stating that a minimum sentence in the mitigated range was warranted because Defendant nearly completed a Bachelor's degree and had a reputation for being a peaceful person. The Court was aware of these factors and weighed them along with other considerations in determining Defendant's sentence. For example, the Court weighed the factors raised by Defendant along with the fact that Defendant had a previous conviction in a home invasion burglary. In light of these and many other factors, Defendant was not entitled to a minimum sentence in the mitigated range.

20

Defendant also claims that the sentence imposed amounted to an unwarranted expression of "victim family sympathy." Again, the Court outlined its reasons for Defendant's sentence in this Opinion and during the sentencing hearing. Defendant offers no explanation as to why the sentence imposed amounted to an unwarranted expression of sympathy for the victim's family. Before issuing Defendant's sentence, the Court did state: "I will express my sympathy to the Cameron family for the loss that they have incurred." N.T., 10/3/12, at 97-98. Apart from this statement, however, there is no indication that the Court was motivated by sympathy for the victim's family, and Defendant cites no authority holding that such a statement constitutes an abuse of discretion.

## CONCLUSION

Based on the foregoing reasons, the Court concludes that the issues Defendant raises in his present 1925(b) statement are without merit. Therefore, the Court respectfully submits that the judgment of sentence should be affirmed. The Beaver County Clerk of Courts is hereby directed to file the record of proceedings in this case with the Superior Court of Pennsylvania.

BY THE COURT,

_____ J.

21